Brian O. O'Mara (Bar No. 229737)
briano@dicellolevitt.com
Steven M. Jodlowski (Bar No. 239074)
stevej@dicellolevitt.com
DICELLO LEVITT LLP
4747 Executive Drive, Suite 240
San Diego, California 92121
(619) 923-3939

Diandra S. Debrosse (*pro hac vice* forthcoming)
fu@dicellolevitt.com
DICELLO LEVITT LLP
505 20th Street S, Suite 1500
Birmingham, Alabama 35203
(205) 855-5700

*Counsel for Plaintiff*

[Additional counsel listed on signature page.]

# IN THE UNITED STATES DISTRICT COURT FOR THE

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBRA MATARAZZO<br><br>               Plaintiff,<br><br>   v.<br><br>HENKEL AG & CO. KGAA, a/k/a HENKEL CONSUMER GOODS, INC.; HENKEL CORPORATION d/b/a HENKEL NORTH AMERICAN CONSUMER GOODS; WELLA INTERNATIONAL OPERATIONS SWITZERLAND S.À.R.L.; WELLA OPERATIONS US LLC d/b/a THE WELLA COMPANY; CLAIROL; L'ORÉAL USA, INC.; L'ORÉAL USA PRODUCTS, INC.; and L'ORÉAL S.A.,<br><br>               Defendants. | Case No.<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## I.    INTRODUCTION

1.    Plaintiff Debra Matarazzo brings this action against Defendants Henkel AG & Co. KGaA a/k/a Henkel Consumer Goods, Inc., and Henkel Corporation d/b/a Henkel North American Consumer Goods (collectively, "Henkel"); Wella International Operations Switzerland S.A.R.L., and Wella Operations US LLC d/b/a The Wella Company (collectively, "Wella"); Clairol ("Clairol"); L'Oréal USA, Inc., L'Oréal USA Products, Inc., and L'Oréal S.A. (collectively, "L'Oréal ") (and altogether, "Defendants"). She asserts claims for negligence, strict liability, failure to warn, fraud and other state and federal causes of action against the Defendants based on the dangerous design and defective manufacturing of their professional hair dye products, as well as their failure to warn her—a professional hair stylist—of the increased risk of bladder cancer caused by long-term exposure to Defendants' products. In support of Plaintiff's claims, Plaintiff states as follows:

## II.    JURISDICTION AND VENUE

2.    This Court has subject-matter jurisdiction over this litigation under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and Plaintiff and Defendants are citizens of different states.

3.    This Court has personal jurisdiction over the Defendants in accordance with the allegations asserted here, as Defendants are authorized to do business and conduct business  in California, have marketed, advertised, and made sales in California, and have sufficient minimum contacts with this State and/or sufficiently avails themselves to the markets of this State through their promotion, sales, and marketing within the State to render the exercise of jurisdiction by this Court allowable.

4.    Venue is proper in the United States District Court for the Central District of California pursuant to 18 U.S.C. 1391(b) and 18 U.S.C. § 1441(a) because Defendants do business within the state of California and this District.

### III.    **PARTIES**

5.      Plaintiff Debra Matarazzo ("Plaintiff") or ("Ms. Matarazzo") is, and at all times relevant to this action was, a citizen and resident of the State of New Jersey.

6.      Henkel AG & Co. KGaA, also known as Henkel Consumer Goods, Inc., is foreign multinational chemical and consumer goods company headquartered at Henkelstrasse 67, 40589 Dusseldorf, Germany, and is the parent company of Henkel Corporation.

7.      Henkel Corporation, doing business as Henkel North American Consumer Goods, is an American company incorporated in Delaware and headquartered in Connecticut. Henkel Corporation is a subsidiary of Henkel AG & Co. KGaA, and has been in the business of manufacturing, distributing, and selling hair dye in the United States for decades.

8.      Wella International Operations Switzerland S.à.r.l. ("Wella International") is a Swiss corporation headquartered in Geneva, Switzerland. Wella maintains two American offices—one in New York, New York, and another in Calabasas, California—and is the parent company of Wella Operations US LLC d/b/a the Wella Company, which itself is the parent company of Clairol.

9.      Wella Operations US LLC d/b/a the Wella Company is a Delaware corporation with its principal place of business and headquarters located at 4500 Park Granada, Suite 100, Calabasas, California 91302. It is a subsidiary of Wella International and the parent company of Clairol.

10.     Clairol is an American corporation with its headquarters and principal place of business located in Stamford, Connecticut. Clairol is incorporated in Delaware and is a subsidiary of Wella Operations US LLC d/b/a the Wella Company.

11.     L'Oréal USA, Inc., is a Delaware corporation with its headquarters and principal place of business located at 575 Fifth Avenue, New York, New York 10017. L'Oréal USA, Inc., is a subsidiary of L'Oréal S.A.

- 2 -
COMPLAINT

12.    L'Oréal USA Products, Inc., is a Delaware corporation with its headquarters and principal place of business located at 10 Hudson Yards 347, 10th Avenue, New York, New York 10001.

13.    L'Oréal S.A. is a foreign corporation with its headquarters and principal place of business in France.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    As a licensed cosmetologist, Ms. Matarazzo was exposed to Defendants' carcinogenic hair dyes each day for 11 years.

14.    Plaintiff Debra Matarazzo ("Ms. Matarazzo") became a licensed cosmetologist in New Jersey in 1988. She spent the next eleven years working at a single salon in Brick, New Jersey.

15.    A core part of Ms. Matarazzo's job as a professional hair stylist was providing hair coloring services for her clients.

16.    Ms. Matarazzo's clients wanted their hair colored for many different reasons. Many felt that their grey hair—a natural result of aging—was unattractive and wanted more "youthful" colors instead, such as blonde, brown, black, or red. Others were simply unsatisfied with their natural hair color or wanted to alter their hair color.

17.    The areas and amounts of hair Ms. Matarazzo colored varied between clients as well. Some only wanted highlights or to have their roots "touched up," some wanted only the tips colored, and others wanted to color the entirety of their hair.

18.    Regardless of the client's desired outcome, the process of coloring hair was substantially the same for each one. Ms. Matarazzo's professional application method involved applying the hair dye by hand and then leaving it in the clients' hair, allowing the hair dye to penetrate and stain the hair to obtain the desired color.

COMPLAINT

19.     After a period of weeks or months, and depending on the hair's natural growth rate, the colored portion of the hair grows away from the scalp as new growth sprouts from the roots. As the hair continues to grow, an obvious contrast emerges between the colored portions and the new hair growth, prompting Ms. Matarazzo's clients to color their hair on a routine basis to match the rest of their hair.

20.     Ms. Matarazzo estimates that she performed anywhere from 75 to 100 hair coloring applications a week over the course of her 11-year professional career, causing her to be exposed to Defendants' toxic hair dye products on a near-daily basis, multiple times per day, as she applied the products to her clients' scalp.

**B.     Defendants designed, marketed, and sold their toxic hair dyes even though they knew that continuous long-term exposure would significantly increase stylists' risk of cancer.[1]**

21.     For decades, Defendants have designed, manufactured, and marketed their hair dye products to customers across the United States and the world. Defendants' marketing schemes heavily leverage branding and slogans that emphasize how dyed hair enhances users' physical beauty, sex appeal, and youthfulness, all while failing to inform consumers, such as plaintiff, of the risks of usage of their hair dyes.

---

[1] The following discussion of various Defendant manufacturers and/or products is not an exhaustive list of all hair dye manufacturers and/or products that have been marketed to professional and retail users, nor is it an exhaustive list of all manufacturers and/or products currently on the market. Rather, it is a representative sample of how each Defendant has marketed their hair dye products throughout the years.

1

**1.    Henkel**

2      22.    Henkel,[2] a multinational powerhouse founded in 1876, began as a

3  detergent manufacturer. But by the mid-20th century, the company had strategically

4  positioned itself within the cosmetic beauty industry. Through many acquisitions

5  and expansion, Henkel cemented itself as a dominant force in the professional hair

6  dye industry.

7      23.    Henkel's foray into the professional hair dye market accelerated in

8  1995 with its acquisition of Schwarzkopf. Under Henkel's control, Schwarzkopf

9  launched lines like *Igora Royal* and *BlondMe*. Using pseudo-scientific marketing

10  jargon, Henkel introduced so-called innovative formulas that promised healthier,

11  shinier hair—all while manufacturing and selling carcinogenic hair dye products.

12      24.    As Henkel expanded its grip on the industry, it acquired Joico, Zotos,

13  and Pravana, in 2017, further expanding its footprint in the professional hair color.

14  With each acquisition, the company tightened its stranglehold on salons, ensuring

15  that professional stylists would continue to utilize their products.

16      25.    Henkel marketed its professional hair dye products as safe,

17  downplaying potential health risks associated with their use. For instance, the

18  Schwarzkopf Professional *Igora Royal* line states that it can attain "true-to-swatch

19  results, up to 100% coverage, and incredible color intensity" with claims of superior

20  scalp comfort, suggesting a product that is both effective and gentle.

21      26.    Similarly, Henkel's *BlondMe*, a high-lift blonde series launched in

22  2007, is marketed as a "damage-protective" and bond-strengthening system, while

23  the webpage for Joico's (a Henkel subsidiary) *Vero K-PAK Color* line claims that it

24  "repairs and protects" hair during the coloring process. These statements misled and

25

26  _____

27  [2] "Henkel," as used herein, refers to Defendants Henkel AG & Co. KGaA a/k/a
   Henkel Consumer Goods, Inc., and Henkel Corporation d/b/a Henkel North

28  American Consumer Goods.

1  continue to mislead stylists into believing that Henkel's hair dye products are safe
2  to use while concealing the fact that they are indeed carcinogenic.

3       27.    One of the most glaring omissions in Henkel's marketing is the failure
4  to inform stylists about the health risks associated with the exposure and handling of
5  these chemical hair dyes, as none of the marketing, advertising, or packaging for
6  Henkel's professional hair dyes contain a warning that prolonged inhalation of hair
7  dye fumes exposes stylists to carcinogenic compounds like aromatic amines,
8  amongst others—a major risk factor for an increased risk of bladder cancer.
9
10            **2.**    **Wella**

11       28.    Wella[3] has long marketed its hair dye products as safe and effective,
12  often emphasizing their commitment to quality and innovation.

13       29.    For example, Wella solidified its grip on the beauty industry with the
14  launch of its *Koleston* hair dye in 1950, which it claims was "the first cream
15  colourant that nourishes the hair."

16       30.    The *Koleston* hair dye became so popular among stylists—reaching 5.5
17  tubes sold worldwide in its first three years—that it spawned multiple subsequent
18  derivative hair dye product lines. According to Wella, the *Koleston 100* series
19  (launched in 1953) contained "a new formula so that hair can be lightened for the
20  first time ever." The *Koleston 200* and *300* series followed in 1959, adding lighter
21  and darker color shades.

22       31.    In 1974, Wella introduced its gel-based *Koleston 2000* line, which it
23  claims "revolutionize[d] hair lightening with a colour system that was not as harsh
24  on the hair." And in 1981, it launched the *Koleston Blonde 2000 Special Blonde*
25
26
27  [3] "Wella" as used herein, refers to Defendants Wella International Operations
28  Switzerland S.A.R.L., and Wella Operations US LLC d/b/a The Wella Company.

1  series with a formula that would "gently colour and care for hair" during the
2  lightening process, allowing darker blondes to go lighter.

3       32.    The decades-long success of *Koleston* hair dye products led Wella to
4  relaunch the *Koleston* product line as "*Koleston Perfect*" in 1995, claiming that it
5  had more natural ingredients that would better ensure healthy hair.

6       33.    *Koleston Perfect* remains one of Wella's most popular professional hair
7  dye product lines, currently marketed as Wella's "purest permanent hair color and
8  the first and only professional hair color combining uncompromised color
9  performance with Metal Purifier and ME+ Dye Technology for true-to-tone color
10 and protection from damage."

11      34.    *Koleston* is not Wella's only prominent hair dye though. Its *Color
12 Touch* product line was launched in 1988 and saw multiple variations across the next
13 several decades including *Color Sensations* in 2002, an advanced hair dye product
14 intended for professional application that allowed for more creative hair colors.

15      35.    Wella's *Illumina Color* line, launched in 2012, is one of the most
16 popular hair dye products commonly used by professional hair stylists. This line is
17 marketed as a breakthrough in hair dye technology which "protects hair while
18 delivering a luminous, natural look." The *Illumina Color* product line is heavily
19 advertised in salons and professional hairdressing communities as a gentler
20 alternative to other hair dyes.

21      36.    Despite its "breakthrough" formulas and Wella's misleading
22 assurances of safety, Wella has never disclosed or warned professionals or
23 consumers that its *Koleston Perfect*, *Color Sensations*, *Illumina Color*, and other
24 professional hair dye products still contain aromatic amines and other carcinogenic
25 properties, and nowhere in the marketing for these products does Wella warn of the
26 increased risk of bladder cancer associated with occupational exposure.

27      37.    Even with Wella's *Color Touch* and *Color Fresh CREATE* product
28 lines—which are each marketed as a "gentle, ammonia-free" hair dyes and

- 7 -

1    advertised as providing "damage-free color" with "a conditioning formula for

2    healthier-looking hair"—these products are still carcinogens.

3

4                    **3.    Clairol**

5    38.    Clairol[4] is a subsidiary of Wella. The company's breakthrough came in

6    1950 with its *Miss Clairol Hair Color Bath* popular hair dye. Its famous slogan,

7    "Does she… or doesn't she?", sought to engrain the belief that that women must

8    conceal gray hair to remain attractive and relevant.

9    39.    Clairol subsequently introduced *Nice 'n Easy* in 1965 for long-lasting

10   results and *Natural Instincts* in the 1990s to target those hesitant about harsh

11   chemicals, touting the product as "the first hair color with a rare blend of natural

12   ingredients—aloe, chamomile, and ginseng—*Natural Instincts* actually leaves your

13   hair better conditioned than before you colored it."[5]

14   40.    Professional lines like *Liquicolor Permanente* and *Beautiful Collection*,

15   both introduced in 2011, extended this grip into salons where stylists became

16   unwitting agents of an industry that profited from convincing women that gray, dull,

17   or uneven hair was unattractive.

18   41.    For example, Clairol's *Professional Liquicolor Permanente Gray*

19   *Busters* line is marketed to hairstylists as "your secret weapon to your clients'

20   fountain of youth[,]" offering "100% gray coverage every time."[6]

21   42.    Another Clairol product, *Beautiful Collection*, is a semi-permanent hair

22   color line advertised as offering "rich, natural-looking color" with "zero-damage."

23

24   [4] "Clairol" as used herein, refers to only to Defendant Clairol.

25   [5] Clairol, 1990s TV Ad for *Natural Instincts* Hair Color, YouTube (Feb. 20, 2024),
     https://youtu.be/psb-MFwKSKo?feature=shared.

26

27   [6] Product Page, *Liquicolor Permanente GRAY BUSTERS*, ClairolPro.com,
     https://www.clairolpro.com/products/color/liquicolor-permanente/information (last

28   accessed Mar. 4, 2025).

43.     Despite growing awareness of harmful chemicals, as set forth below, in hair dyes, Clairol continues to prioritize profit over stylists' and consumers' health. Unlike products in industries where chemical exposure is a known hazard, Clairol's salon-use dyes do not carry visible warnings on the risks of prolonged exposure, nor do they encourage the use of protective items, including but not limited to, masks or enhanced ventilation beyond generic safety instructions. Many stylists, unaware of the scientifically established links between prolonged dye exposure and bladder cancer, continue to apply these products daily, unknowingly increasing their risk of developing bladder cancer.

### 4.     L'Oréal

44.     In 1978, L'Oréal[7] launched *Majirel*, "the first-ever protective color" product it designed exclusively for application by professional stylists in salon settings. The *Majirel* hair dye line allowed L'Oréal 's to permeate the salon industry, offering a "conditioning" permanent hair dye that disguised the products' harsh chemical processes behind promises of nourishment.

45.     L'Oréal later introduced *iNOA* in 2009, touting its "first-ever ammonia free" permanent hair color product.

46.     In recent years, L'Oréal has continued its calculated approach. By launching "natural" options like *Botanea*, the company sought to lure in more health-conscious consumers, still while failing to provide notice of the increased risk of bladder cancer attendant to occupational use of hair dyes.

---

[7] L'Oréal" as used herein, refers to Defendants L'Oreal USA, Inc., L'Oreal USA Products, Inc., and L'Oreal S.A.

1    **C.    Defendants designed and made their hair dyes using ingredients**
2    **which they knew were carcinogenic.**

3        47.    The defendants' hair dye products are carcinogenic, and include
4    carcinogens such as aromatic amines, especially 4-aminobiphenyl (4-ABP), and
5    others such as benzidine, 2-naphthylamine, and 4-chloro-o-toluidine.    Several
6    countries banned the use of these carcinogens in hair dyes in the 1970s, but studies
7    since then show that these ingredients still remain in Defendants' hair dyes,
8    especially 4-ABP and other aromatic amines.

9        48.    A number of American and international governmental bodies have
10   identified known and suspected human carcinogens in hair dyes, corroborating a link
11   between hair dyes and bladder cancer.

12       49.    The World Health Organization's International Agency for Research
13   on Cancer ("IARC") convenes working groups of world-renowned experts on cancer
14   biology, epidemiology, and other relevant sciences to review specific potential
15   carcinogen exposures and risk of developing specific cancers.    IARC has reviewed
16   and published results of its analysis of carcinogens related to hair dye exposure and
17   its constituent chemicals.    It has published papers on carcinogenic effects of hair
18   dyes and occupations with high hair dye exposure in 1971, 1978, 1982, 1987, 1993,
19   2001, 2010, 2012, and 2020.

20       50.    IARC has classified several hair dye constituents as human carcinogens
21   (Group 1): benzidine, 4-aminobiphenyl (4-ABP), 2-naphthylamine, ortho-Toluidine,
22   and 4,4'-Methylenebis.    The IARC also classified 4-Chloro-ortho-Toluidine as
23   "probably carcinogenic to humans" (Group 2A).

24       51.    A 2012 IARC paper which reviewed data from animal exposure studies
25   and human occupational exposure studies found that "[t]here is sufficient evidence
26   in humans for the carcinogenicity of 4-Aminobiphenyl," and concluded that 4-ABP
27   "causes bladder cancer in humans." In that same report, IARC also concluded that
28   there is strong evidence indicating that 4-ABP is genotoxic, involving metabolic

1   activation, formation of DNA adducts, and induction of mutagenic (causing genetic
2   mutation) and clastogenic (causing chromosome breakage) effects.

3       52.    The U.S. Department of Health and Services' National Toxicology
4   Program ("NTP") has identified o-Toluidine and Coal Tars and Coal-Tar Pitches as
5   "known carcinogens" among hair dyes' ingredients. It also classified other
6   chemicals in the products as "reasonably anticipated to be a human carcinogen."
7   including,     2,4Diaminoanisole     Sulfate;     4-Chloro-o-phenylenediamine;
8   2,4Diaminotoluene; Disperse Blue 1; Benzidine and dyes metabolized to benzidine;
9   Basic Red 9 Monohydrochloride; and 4,4′Oxydianiline.

10      53.    The FDA acknowledges that two carcinogens are commonly contained
11  in hair dyes: 4-methoxy-m-phenylenediamine 2,4-diaminoanisole and 2, 4-methoxy-
12  m-phenylenediamine sulfate 2,4-diaminoanisole sulfate.

13      54.    The National Cancer Institute of the National Institutes of Health
14  ("NIH") associates hair dye exposure with an increased risk of developing bladder
15  cancer.

16      55.    The American Cancer Society notes that hairstylists have an increased
17  risk for bladder cancer, and states that this is "probably because of heavy exposure
18  to hair dyes."   Relying on other organizations' analysis, the American Cancer
19  Society lists several ingredients from hair dyes as known human carcinogens (i.e.,
20  IARC Group 1), including: 4-aminobiphenyl (4-ABP); benzidine; and ortho-
21  toluidine.  The American Cancer Society also lists the following ingredients of hair
22  dye as probable human carcinogens (i.e., IARC Group 2A): aniline and aniline
23  hydrochloride; 4-chloro-ortho-toluidine.

24      56.    There are several possible biological mechanisms that could explain
25  associations between occupational exposure to hair dye products and an increased
26
27
28

1  risk of bladder cancer.  For example, a 1975 study by the University of California,

2  Berkley, found that multiple constituents in hair dyes were mutagenic.[8]

3      57.    Highly    relevant    to    bladder    cancer    is    the    discovery    that

4  paraphenylenediamine ("PPD"), one of most common aromatic amines used in

5  Defendants' hair dyes, is genotoxic to uroepithelial cells, which line the inside of the

6  bladder and form the majority of bladder cancers.

7      58.    The presence and number of DNA adducts are considered a direct

8  measure of how much a carcinogen has bound to a cell's DNA, which can induce

9  mutagenesis.  Lactating women who use hair dye were eight times more likely to

10 have 4-ABP-DNA adducts in breast epithelium excreted in milk compared to non-

11 hair-dye users.  Among women who had used hair dye more than once in the past 6

12 months, the risk of having 4-ABP DNA adducts increased by 11 times. Risk was

13 increased similarly for temporary and permanent hair dye.

14     59.    Defendants were aware or should have been aware of the increased risk

15 of developing bladder cancer from the occupational use of their hair dye products

16 based on their access to these and other scientific studies, ongoing research, internal

17 analysis, and various government standards and regulations.

18 **D.    Multiple reliable peer-reviewed studies confirm that frequent**
**and long-term exposure to the Defendants' hair dye products**
19 **causes bladder cancer.**
20

21     60.    Dozens of scientific studies in the United States and abroad, conducted

22 over many decades, have consistently shown an increased risk of bladder cancer

23 from occupational exposure to hair dye products.

24     61.    The risk of developing bladder cancer from hair dyes is particularly

25 great for hairstylists like Plaintiff because of her frequent exposure to hair dyes in

26 _____

27 [8] *See* Bruce N. Ames et al., *Hair Dyes are Mutagenic: Identification of a Variety of Mutagenic Ingredients*, 72 Proc. Nat'l Acad. Sci. 2423 (1975),

28 https://doi.org/10.1073/pnas.72.6.2423.

1    her everyday employment.  Hairstylists' exposure to the carcinogenic chemicals in

2    Defendants' hair dyes is far greater than those who use and apply hair dyes at home.

3         62.    A number of studies have analyzed the risk of bladder cancer among

4    hairstylists.  These studies consistently show that ***working as a hairstylist increases***

5    ***the risk of bladder cancer by 30% or more***.  Moreover, the most recent global meta-

6    analysis of occupational risk and bladder cancer also found that the risk of bladder

7    cancer ***mortality*** was 16% higher among hairstylists.

8         63.    Two meta-analyses (which aggregate the results of many individual

9    studies) specifically focus on the risk of bladder cancer among hairstylists.  A 2010

10   meta-analysis by Harling *et al.*[9], aggregated the findings of 42 other studies on this

11   topic, each of which involved hairstylists with clinically confirmed bladder cancer.

12   This analysis found that overall, ***hair stylists are 34% more likely to develop bladder***

13   ***cancer as a result of occupational exposure to hair dyes***.

14        64.    Among the studies evaluated by Harling *et al.*, that focused on long-

15   term exposure, three looked at people who worked as a hairstylist for five years or

16   longer.  ***The relative risk of bladder cancer in that group was 52% greater***.

17        65.    Together, the studies analyzed by Harling *et al.* ranged from the 1970s,

18   1980s, and 1990s and beyond suggesting that any changes in hair dye formulation

19   over time have not sufficiently reduced carcinogen exposure for hairstylists.

20        66.    Harling *et al.* also found consistent increases in risk across broad

21   geographic areas in the United States and Canada. Additionally, the relative risk of

22   bladder cancer was almost identical between the studies that adjusted for smoking

23   and those that did not.

24

25

26   _____

27   [9] Melanie Harling et al., *Bladder Cancer Among Hairdressers: A Meta-Analysis*,
     67 Occupational Env't Med. 351 (2010),

28   https://doi.org/10.1136/oem.2009.050195.

- 13 -
COMPLAINT

67.    Another meta-analysis—published in the *International Journal of Epidemiology* in 2009 by Takkouche *et al.*—aggregated the results of 34 studies on cancer risk among hairstylists from 1966 to 2009.[10]  Across the studies, the relative risk of bladder cancer in hairstylists and related occupations was 36% higher.  ***For the subset of studies that looked at mortality from bladder cancer, the relative risk was 53% greater.***  In the four studies that focused on people with more than 10 years of hairdressing experience (versus no hairdressing), the risk for bladder cancer ***almost doubled*** (93% greater).  The report found no substantial difference in relative risk by time period, whether the studies were performed in the 1970s or later.

68.    Other meta-analyses have evaluated the risk of bladder cancer across many professions, including hairstylists.  First, a 2015 global meta-analysis by Cumberbatch *et al*. in *JAMA Oncology* found that not only did the risk of bladder cancer increase by 32% among hairstylists, but also that the risk of *mortality* from bladder cancer increased by 16%.[11]  It also found that the risk of bladder cancer was highest among occupations in which employees were routinely exposed to aromatic amines, specifically listing hairstylists as one of the occupations at issue.

69.    The Cumberbatch *et al*. study found that the main carcinogen for hairstylists is 4-aminobiphenyl (4-ABP), which the World Health Organization's International Agency for Research on Cancer has designated as carcinogenic to humans (*i.e.* a Group 1 carcinogen).  Although the chemical has been restricted since

---

[10] Bahi Takkouche et al., *Risk of Cancer Among Hairdressers and Related Workers: A Meta-Analysis*,  38 Int'l J. Epidemiology 1512 (2009), https://doi.org/10.1093/ije/dyp283.

[11] Marcus G. K. Cumberbatch et al., *Contemporary Occupational Carcinogenic Exposure and Bladder Cancer: A Systematic Review and Meta-Analysis*, 1 JAMA Oncology 1382 (2015), https://doi.org/10.1001/jamaoncol.2015.3209.

1    the 1970s, a 2003 study by Turesky *et al.* found that 4-ABP was present in eight out
2    of eleven hair dyes they purchased and tested that year purchased.[12]

3         70.    Second, a 2008 meta-analysis of bladder cancer across occupations by
4    Reulen *et al.* looked at 29 individual studies and found that the relative risk of
5    bladder cancer among hairstylists was 23% greater.  The authors identified
6    hairstylists' frequent exposure to hair dyes as the likely culprit of the increased risk,
7    explaining that hair dyes "may contain arylamines, which may be absorbed via the
8    skin or inhaled by the lungs," and that "[o]nce processed in the body, concentrated
9    amounts of arylamines may be found in the bladder, inducing carcinogenic processes
10   and eventually leading to the development of bladder tumours."[13]

11        71.    Third, a 2003 meta-analysis looked at 11 studies of bladder cancer in
12   men in Western Europe between 1976 and 1997, which were based on more than
13   3,000 cases.  The study investigated associations with occupational exposures.
14   Among people who worked for more than 25 years as a hairstylist, the study found
15   a 60% increase in the risk of bladder cancer.[14]

16        72.    Many other individual studies have also found an increased risk of
17   bladder cancer among hairstylists.  For example, a 2015 study of 15 million
18   individuals in Northern Europe, which investigated links between occupational
19   history and cancer risk, found that professional hair coloring was associated with the

---

[12] Robert J. Turesky et al., *Identification of Aminobiphenyl Derivatives in Commercial Hair Dyes*, 16 Chem. Res. Toxicology 1162 (2003), https://doi.org/10.1021/tx030029r.

[13] Raoul C. Reulen et al., *A Meta-Analysis on the Association Between Bladder Cancer and Occupation*, 42 Scandinavian Journal of Urology and Nephrology 74 (2010), https://doi.org/10.1080/03008880802325192.

[14] Manolis Kogevinas et al., *Occupation and Bladder Cancer Among Men in Western Europe*, 14 Cancer Causes & Control 907 (2003), https://doi.org/10.1023/b:caco.0000007962.19066.9c.

second-highest risk level for bladder cancer.[15]  A nationwide study in New Zealand in 2008 found that *hairstylists were over nine times more likely to develop bladder cancer*.[16]  A 2005 study of occupation and bladder cancer in Sweden found a 26% increased risk of bladder cancer among hairstylists.[17]  A 2001 publication studying a Los Angeles population of 1,500 cases found that those who had ever been employed as a hairstylist or barber were at a 50% increased risk of bladder cancer—but  for the people who had worked as a hairstylist or barber for over 10 years, *the relative risk became 510% greater*.[18]

### E.    The Defendants' hair dyes are not FDA-approved.

73.    Federal law does not require cosmetic products or ingredients, other than color additives, to have FDA approval before they go to market. However, there are laws and regulations which apply to cosmetics placed into the market.

74.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.  *Id.* §§ 361-362.  Adulteration refers to a violation involving product composition, whether the adulteration results from ingredients, contaminants, processing, packaging, shipping, or handling.  *Id.* § 361. Under the

---

[15] Eero Pukkala et al., *Occupation and Cancer—Follow-up of 15 Million People in Five Nordic Countries*, 48 Acta Oncologica 646 (2009), https://doi.org/10.1080/02841860902913546.

[16] Evan Dryson et al., *Case-Control Study of High Risk Occupations for Bladder Cancer in New Zealand*, 122 Int'l J. Cancer 1340 (2008), https://doi.org/10.1002/ijc.23194.

[17] Jianguang Ji et al., *Occupation and Bladder Cancer: A Cohort Study in Sweden*, 92 British J. Cancer 1276 (2005), https://doi.org/10.1038/sj.bjc.6602473.

[18] Manuela Gago-Dominguez et al., *Permanent Hair Dyes and Bladder Cancer: Risk Modification by Cytochrome P4501A2 and N-acetyltransferases 1 and 2*, 24 Carcinogenesis 483 (2003), https://doi.org/10.1093/carcin/24.3.483.

1    FDCA, a cosmetic is adulterated if it contains any poisonous or deleterious substance

2    causing injury to the product user, or if its container is composed, in whole or in part,

3    of any poisonous or deleterious substance which may render the contents injurious

4    to health. *Id*. Misbranding refers to violations involving improperly labeled or

5    deceptively packaged products. *Id.* § 362.

6         75.    Under the Fair Packaging and Labeling Act, 15 U.S.C. § 1451 *et seq.*

7    ("FPLA"), a cosmetic is misbranded if:  (1) its labeling is false or misleading, (2)

8    the label does not include all required information, (3) required information is not

9    prominent and conspicuous, or (4) the packaging and labeling violates an applicable

10   regulation issued pursuant to Sections 3 and 4 of the Poison Prevention Packaging

11   Act of 1970.

12        76.    Under federal law, cosmetics manufacturers are not required to submit

13   their safety data to the FDA.  However, it is against the law to put an ingredient in a

14   cosmetic that makes the cosmetic harmful when used as intended.[19]  An example of

15   such an ingredient is methylene chloride because it causes cancer in animals and is

16   likely harmful to humans.  21 C.F.R. § 700.19.

17        77.    Companies and individuals who manufacture and/or market cosmetics

18   have a legal responsibility and duty to ensure the safety of their products.  The FDA

19   has consistently advised cosmetics manufacturers to use whatever testing is

20   necessary to ensure the safety of their products and ingredients, which may be

21   determined through:  (a) reliance on already available toxicological test data on

22   individual ingredients and product formulations that are similar in composition to

23

24

25

26   _____
[19] *Prohibited & Restricted Ingredients in Cosmetics*, U.S. Food and Drug
27   Administration, https://www.fda.gov/cosmetics/cosmetics-laws-
     regulations/prohibited-restricted-ingredients-cosmetics
28

1    the cosmetic at issue, and (b) performing any additional toxicological tests or other

2    tests that are appropriate in light of such existing data and information.[20]

3        78.    Except for color additives and ingredients prohibited or restricted by

4    regulation, a manufacturer may use any ingredient in the formulation of a cosmetic,

5    provided that: (1) the ingredient and the finished cosmetic are safe under labeled or

6    customary conditions of use, (2) the product is properly labeled, and (3) the use of

7    the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded

8    under the laws the FDA enforces.

9        79.    With regard to whether the product is properly labeled, 21 CFR § 740.1

10   defines the warning statements required for cosmetic products.  Section 740.1 states,

11   "The label of a cosmetic product ***shall*** bear a warning statement whenever necessary

12   or appropriate to prevent a health hazard that ***may*** be associated with the product"

13   (emphasis added).  This duty to warn corresponds to the broad responsibility of

14   manufacturers to ensure that their cosmetic products are safe under labeled or

15   customary conditions of use, properly labeled, and not adulterated or misbranded

16   under FDA laws.

17       80.    When a manufacturer is unable to adequately substantiate the safety of

18   their product before marketing it, the product is misbranded if the principal display

19   panel does not include the following "conspicuous statement" from 21 CFR §

20   740.10: ": "*Warning* – The safety of this product has not been determined."

21       81.    The current regulatory framework requires Defendants to assess the

22   safety of their hair dye Products and warn users, including professional hairstylists,

23   of any and all health hazards.

24

25

---

26   [20] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but
     Are FDA-Regulated*, U.S. Food and Drug Administration, Mar. 3, 2005,

27   https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-

28   cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated.

82.     Further, Defendants had the capacity to design hair dye Products that were safer than the Products they manufactured, marketed, and sold.  The alternative Product designs that Defendants could have used would not have changed the intended purpose of the Products.  Such alternative safer designs include, but are not limited to, replacing toxic chemicals with readily available natural ingredients.

**F.     Ms. Matarazzo developed bladder cancer from her exposure to Defendants' hair dyes, forcing her to undergo painful, stressful, and expensive treatment and monitoring.**

83.     Ms. Matarazzo used and applied professional hair dyes manufactured by Henkel AG & Co. KGaA a/k/a Henkel Consumer Goods, Inc.; Henkel Corporation d/b/a Henkel North American Consumer Goods; Wella International Operations Switzerland S.A.R.L, Wella Operations US LLC d/b/a The Wella Company; Clairol; L'Oréal  USA, Inc.; L'Oréal  USA Products, Inc.; and L'Oréal S.A. at various points while working as a professional hair stylist from 1988 to 1999.

84.     For each hair dye used, Ms. Matarazzo mixed and applied the product in accordance with the instructions provided on the product's label or contained within its packaging.

85.     None of the Defendants' hair dyes that Ms. Matarazzo used and applied contained any warning that long-term occupational exposure to Defendants' products could cause bladder cancer or increase the risk of developing bladder cancer.

86.     Ms. Matarazzo was diagnosed with bladder cancer in October of 2017. She was fifty years old at the time of her diagnosis.

87.     Ms. Matarazzo suffered significant pain and mental distress from the chemotherapy treatment that she underwent to try and treat her cancer.  She had surgery to remove the cancer in November of 2017, which was incredibly painful and expensive. The recovery process was long and filled with nausea, pain, and

depression. She still has to have a scope inserted into her bladder every six months to see if her cancer has worsened.

88.     Ms. Matarazzo has suffered injuries, including her bladder cancer and the resulting necessary treatments, which were directly and proximately caused by her exposure to and use of Defendants' hair dyes.

89.     Ms. Matarazzo has also suffered pain and severe emotional distress as a result of her bladder cancer, related treatments, and related health problems.

90.     Ms. Matarazzo did not know and could not know that her occupational exposure to Defendants' hair dye products could cause her bladder cancer.

91.     Additionally, the running of any statute of limitations has been equitably tolled by reason of Defendants' conduct. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with the exposure the hair dye products.

92.     As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know, or could not have reasonably learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged.

93.     As a result of Defendants' acts and/or omissions, Ms. Matarazzo has suffered and will continue to suffer bladder cancer and other physical injuries, medical and hospital costs, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Ms. Matarazzo is entitled to recover.

COMPLAINT

**V.    CAUSES OF ACTION**

**COUNT I:**

**Strict Liability (Failure to Warn)**

***Against All Defendants***

94.    Plaintiff incorporates by reference the allegations contained in Paragraphs 14 to 93 as if fully restated herein.

95.    At all pertinent times, Defendants manufactured, marketed, promoted, sold, and/or distributed their hair dye products in the regular course of business.

96.    Defendants designed their hair dye products to be used and applied by professional hair stylists such as Plaintiff. Defendants knew then, and still know now, that these stylists generally use and apply hair dyes on a daily basis, multiple times per day, and therefore it was foreseeable that Plaintiff would do so.

97.    Plaintiff did in fact use and apply Defendants' hair dye products apply by hand to her clients' hair on a daily basis, multiple times per day, over the course of her 11-year career as a professional hair stylist.

98.    Plaintiff used and applied Defendants' hair dye products in a manner intended and/or foreseeable by Defendants, and in accordance with all instructions provided to her by Defendants.

99.    Defendants' hair dye products reached Plaintiff without any substantial changes to the condition in which they were manufactured, sold, or otherwise released into the stream of commerce by Defendants.

100.    At all pertinent times, Defendants knew or should have known that the occupational use of their hair dye products—by professional hair stylists, in particular—significantly increases the risk of developing severe and/or life-threatening health conditions, specifically bladder cancer. Defendants knew or should have known that this risk exists even when their products are used (or misused) in the intended manner, or in a manner reasonably foreseeable to Defendants.

- 21 -

COMPLAINT

1    101.   Such risks were known and/or knowable to Defendants at all pertinent times, especially, but not solely because of, the scientific, peer-reviewed academic literature available at the time Defendants designed, manufactured, marketed, and sold their hair dye products.

102.  Defendants knew or should have known that the ordinary consumers/users of their hair dye products, especially professional stylists such as Plaintiff, would not have (and did not) recognize or discover the increased risk of bladder cancer caused by the occupational use of Defendants' hair dye products.

103.   Defendants owed a duty to Plaintiff, as a professional hair stylist and foreseeable user of their products, to warn her of that occupational exposure to Defendants' hair dye products significantly increases her risk of bladder cancer.

104.   Despite their knowledge of the risks, Defendants failed to warn Plaintiff—through their products' labeling, packaging, instructions, marketing, advertising, or any other mode of communication—that frequent, daily, continuous, and/or long-term exposure to their hair dye products, especially by professional hair stylists, could cause or greatly increase the risk of bladder cancer.

105.   As a direct and proximate result of Defendants' failure to warn, Plaintiff has suffered and will continue to suffer bladder cancer and other physical injuries, medical and hospital costs, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Plaintiff is entitled to recover. Defendants' failure to warn Plaintiff was a substantial factor in causing each of the damages outlined herein.

106.   As a result of Defendants' lack of adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, Defendants are liable for damages to Plaintiff.

1

2

3

**COUNT II:**

**<u>Strict Liability (Design & Manufacturing Defect)</u>**

***Against All Defendants***

4          107.   Plaintiff incorporates by reference the allegations contained in

5    Paragraphs 14 to 93 as if fully restated herein.

6          108.   At all relevant times, Defendants designed, developed, manufactured,

7    marketed, sold, and distributed their hair dye products in a defective and

8    unreasonably dangerous condition.

9          109.   Defendants placed (or caused to be placed) their hair dye products into

10   the stream of commerce to be sold, used, and applied at professional hair salons by

11   professional hair stylists.

12         110.   Defendants' hair dye products were expected to (and did) reach

13   professional hair stylists, including Plaintiff, without any change in the condition in

14   which they were manufactured and sold by Defendants and/or otherwise released

15   into the stream of commerce.

16         111.   In each instance, Plaintiff used and applied Defendants' hair dye

17   products in a manner intended, recommended, promoted, marketed, and reasonably

18   foreseeable by Defendants.

19         112.   Defendants' hair dye products failed to perform safely even though

20   Plaintiff used and applied Defendants' hair dye products in a manner intended,

21   recommended, promoted, marketed, and reasonably foreseeable by Defendants.

22         113.   The increased risk of bladder cancer caused by occupational exposure

23   to Defendants' hair dyes, even when used as instructed and/or intended, renders the

24   products unreasonably dangerous to an extent beyond what would have been

25   contemplated by an ordinary, reasonable user—especially professional stylists such

26   as Plaintiff.

27         114.   Any benefits of Defendants' hair dye products as they were designed

28   and manufactured were and continue to be substantially outweighed by the

1  significant health risks inherent in the way that Defendants designed and
2  manufactured the products at the pertinent times.

3      115.   Defendants' hair dye products are inessential cosmetic products that do
4  not treat or cure any serious disease.

5      116.   Defendants could have manufactured and designed their products in
6  safer, alternative ways. For example, Defendants did not and do not have to use
7  known and/or probable carcinogens in the design and manufacturing of their hair
8  dye products. They could have designed and manufactured their products without
9  such ingredients, but they chose not to.

10     117.   Defendants knew, or by the exercise of reasonable care should have
11 known, that their hair dye products were and are unreasonably dangerous because of
12 their carcinogenic nature.  Nonetheless, Defendants designed, manufactured, sold,
13 distributed, marketed, promoted, and supplied their products to professional hair
14 salons and stylists, including Plaintiff.

15     118.   The sale of their hair dye products benefits Defendants with revenue
16 and profits, but it does so at the expense of the health and safety of Plaintiff and
17 others like her in conscious disregard of the foreseeable harm to those users.

18     119.   Defendants owed a duty to Plaintiff and all other reasonably foreseeable
19 users to design their products to be safe for ordinary use.

20     120.   As a direct and proximate result of Defendants' defective design and/or
21 manufacturing of their hair dye products, Plaintiff suffered and will continue to
22 suffer bladder cancer and other physical injuries, medical and hospital costs,
23 economic damages, severe emotional distress, mental pain and suffering, fear of
24 cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience,
25 loss of enjoyment of life, lost wages and other damages under the law, which
26 Plaintiff is entitled to recover.

27     121.   Defendants' defective design and manufacture of their products was a
28 substantial factor in causing Plaintiff's harm.

122.   As a result of Defendants' manufacture, sale, and/or distribution of defective products, Defendants are liable in damages to Plaintiff.

## COUNT III:
### Negligent Failure to Warn
#### *Against All Defendants*

123.   Plaintiff incorporates by reference the allegations contained in Paragraphs 14 to 93 as if fully restated herein.

124.   At all pertinent times, Defendants manufactured, marketed, promoted, sold, and/or distributed their hair dye products in the regular course of business.

125.   Defendants designed their hair dye products to be used and applied by professional hair stylists such as Plaintiff. Defendants knew then, and still know now, that these stylists generally use and apply hair dyes on a daily basis, multiple times per day, and therefore it was foreseeable that Plaintiff would do so.

126.   Plaintiff did in fact use and apply Defendants' hair dye products apply by hand to her clients' hair on a daily basis, multiple times per day, over the course of her 11-year career as a professional hair stylist.

127.   Plaintiff used and applied Defendants' hair dye products in a manner intended and/or foreseeable by Defendants, and in accordance with all instructions provided to her by Defendants.

128.   Defendants' hair dye products reached Plaintiff without any substantial changes to the condition in which they were manufactured, sold, or otherwise released into the stream of commerce by Defendants.

129.   At all pertinent times, Defendants knew or should have known that the occupational use of their hair dye products—by professional hair stylists, in particular—significantly increases the risk of developing severe and/or life-threatening health conditions, specifically bladder cancer. Defendants knew or

1   should have known that this risk exists even when their products are used (or

2   misused) in the manner intended, or reasonably foreseeable to, Defendants.

3         130.   Such risks were known and/or knowable to Defendants at all pertinent

4   times, especially, but not solely because of, the scientific, peer-reviewed academic

5   literature available at the time Defendants designed, manufactured, marketed, and

6   sold their hair dye products.

7         131.  Defendants knew or should have known that the ordinary

8   consumers/users of their hair dye products, especially professional stylists such as

9   Plaintiff, would not have (and did not) recognize or discover the increased risk of

10   bladder cancer caused by the occupational use of Defendants' hair dye products.

11         132.   Defendants owed a duty to Plaintiff, as a professional hair stylist and

12   foreseeable user of their products, to warn her that occupational exposure to

13   Defendants' hair dye products significantly increases her risk of bladder cancer.

14         133.   Despite their knowledge of the risks, Defendants failed to warn

15   Plaintiff—through their products' labeling, packaging, instructions, marketing,

16   advertising, or any other mode of communication—that frequent, daily, continuous,

17   and/or long-term exposure to their hair dye products, especially by professional hair

18   stylists, could cause or greatly increase the risk of bladder cancer.

19         134.   As a direct and proximate result of Defendants' failure to warn, Plaintiff

20   has suffered and will continue to suffer bladder cancer and other physical injuries,

21   medical and hospital costs, economic damages, severe emotional distress, mental

22   pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear,

23   annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages

24   under the law, which Plaintiff is entitled to recover. Defendants' failure to warn

25   Plaintiff was a substantial factor in causing each of the damages outlined herein.

26         135.   As a result of Defendants' lack of adequate and sufficient warnings and

27   instructions, and their inadequate and misleading advertising, Defendants are liable

28   for damages to Plaintiff.

1

**COUNT IV:**

2

**<u>Gross Negligence</u>**

3

***Against All Defendants***

4       136.   Plaintiff incorporates by reference the allegations contained in

5   Paragraphs 14 to 93 as if fully restated herein.

6       137.   At all relevant times, Defendants engaged in the design, development,

7   manufacture, marketing, sale, and distribution of their hair dye products in a

8   defective condition unreasonably dangerous to professional hairstylists, including

9   Plaintiff, and other users of their hair dye products.

10       138.   Defendants caused the products to enter the stream of commerce and to

11   be sold through various retailers, at which they were purchased by Plaintiff or by her

12   employer for her use at work.

13       139.   Defendants' hair dye products were expected to, and did, reach

14   professional hair stylists, including Plaintiff, without change in the condition in

15   which it was manufactured and sold by Defendants and/or otherwise released into

16   the stream of commerce.

17       140.   Plaintiff used Defendants' hair products in a manner normally intended,

18   recommended, promoted, and marketed by Defendants.

19       141.   Defendants' hair dyes failed to perform safely when used by Plaintiff

20   in a reasonably foreseeable manner, as evident by the fact that they increased her

21   risk of developing bladder cancer.

22       142.   Defendants knew, or by the exercise of reasonably care should have

23   known, that their hair dye products are unreasonably dangerous. Nevertheless, they

24   have continued to design, manufacture, sell, distribute, market, promote, and supply

25   their hair dyes to maximize sales and profits at the expense of public health and

26   safety, and in conscious disregard of the foreseeable harm to the consuming public,

27   including Plaintiff.

28

143.    Defendants owed a duty to all reasonably foreseeable users, especially Plaintiff (a professional hair stylist) to design their hair dye products in a way that is safe when used as intended or reasonably foreseen.

144.    At all pertinent times, Defendants:

(a)    Failed to design their hair dye products so that they were safe when used as intended or in a manner reasonably foreseeable to Defendants;

(b)    Failed to manufacture their hair dye products so that they were safe when used as intended or in a manner reasonably foreseeable to Defendants;

(c)    Failed to use safer, feasible alternative designs in the design of their hair dye products so that they were safe when used as intended or in a manner reasonably foreseeable to Defendants;

(d)    Failed to properly warn Plaintiff of the known or knowable increased risk of bladder cancer associated with occupational use of their products;

(e)    Failed to properly test their hair dye products to determine their safety—and/or the adequacy and effectiveness of warnings and/or instructions in the labeling, packaging, instructions, advertising, or marketing of their products—as it relates to occupational use by professional hair stylists such as Plaintiff;

(f)    Failed to instruct or inform users, including Plaintiff, of adequate safety and handling measures when using their products; and/or

(g)    Misled, misrepresented, and/or falsely stated that their hair dye products were safe to use.

145.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered and will continue to suffer medical and hospitals, physical injury, economic damages, severe emotional distress, mental pain and suffering, fear of cancer recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of enjoyment of life, lost wages and other damages under the law, which Plaintiff is entitled to recover.

1    146.   Defendants' negligence was a substantial factor in causing Plaintiff's

2    harm—specifically, her bladder cancer.

3    147.   As a result of Defendants' acts and omissions, Defendants are liable to

4    Plaintiff for damages caused by their negligence.

5

6                              **COUNT V:**

7                               <u>**Fraud**</u>

8                         *Against All Defendants*

9    148.   Plaintiff hereby incorporates by reference the allegations contained in

10   Paragraphs 14 to 93 as if fully restated herein.

11   149.   Defendants engaged in the development, manufacture, marketing, sale

12   and distribution of their hair dye products, and thus owed a duty to provide accurate

13   and complete information regarding the safety of said products.

14   150.   Defendants each fraudulently misrepresented the use of their hair dye

15   products as safe. For example:

16         (a)    Henkel marketed its professional hair dye products as safe, often

17   downplaying potential health risks associated with their use. For instance, it

18   marketed its Schwarzkopf Professional *Igora Royal* line with claims of superior

19   scalp comfort, suggesting a product that is both effective and gentle.

20         (b)    Wella's *Illumina Color* line was marketed as a breakthrough in

21   hair dye technology which "protects hair while delivering a luminous, natural look."

22         (c)    Clairol's product, *Beautiful Collection*, is a semi-permanent hair

23   color line advertised as offering "rich, natural-looking color" with "zero-damage."

24         (d)    L'Oréal marketed *Majirel*, as "the first-ever protective color"

25   product designed exclusively for application by professional stylists in salons.

26   151.   Defendants made the above misrepresentations and false statements

27   despite knowing that they were false.

28

1    152.   At all pertinent times, Defendants committed of one or more of the

2    following acts and/or omissions:

3          (a)    Knowingly made misrepresentations that were material, false,

4    incomplete, misleading, deceptive and deceitful;

5          (b)    Knowingly made omissions that were material, false,

6    incomplete, misleading, deceptive and deceitful;

7          (c)    Knowingly made misrepresentations for the purpose of

8    deceiving and defrauding users, including Plaintiff; or

9          (d)    Knowingly made omissions for the purpose of deceiving and

10   defrauding users, including Plaintiff.

11   153.   Plaintiff relied, with reasonable justification, on the misrepresentations

12   by Defendants, which induced her to purchase and use their hair dye products on a

13   regular basis for years.

14   154.   Defendants profited, significantly, from their unethical and illegal

15   conduct that fraudulently induced Plaintiff and other professional hairstylists like

16   her to use their dangerous and defective products in their everyday work.

17   155.   Defendants' fraudulent and misleading representations, and Plaintiff's

18   justifiable reliance thereon, were substantial contributing factors in causing

19   Plaintiff's injuries.

20   156.   As a direct and proximate result of Defendants' fraud, Plaintiff has

21   suffered and will continue to suffer medical and hospitals, physical injury, economic

22   damages, severe emotional distress, mental pain and suffering, fear of cancer

23   recurrence, humiliation, embarrassment, fear, annoyance, inconvenience, loss of

24   enjoyment of life, lost wages and other damages under the law, which Plaintiff is

25   entitled to recover.

26   157.   Defendants are liable to Plaintiff for damages caused by their fraud.

27

28

1

2

3

**COUNT VI:**

**Violations of California Unfair Competition Law**

***Against All Defendants***

4

5

158.   Plaintiff hereby incorporates by reference the allegations contained in Paragraphs 14 to 93 as if fully restated herein.

6

7

8

9

159.   Plaintiff asserts this claim pursuant to the   California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*., prohibits "unfair competition" including any "unlawful, unfair or fraudulent business act or practice."

10

11

12

160.   Defendants engaged in unlawful, unfair and fraudulent business acts and practices in violation of the UCL.  Defendants' conduct violates the UCL in at least the following ways:

13

14

(a)     failing to disclose or warn Plaintiff of the hazards associated with the use of the products;

15

16

17

(b)     failing to properly test their products to determine adequacy and effectiveness or safety measures, if any, prior to releasing the Products for consumer use;

18

19

(c)     failing to properly test their Products to determine the increased risk of bladder cancer during the normal and/or intended use of the products;

20

21

22

23

(d)     failing to inform ultimate users, such as Plaintiffs, as to the safe and proper methods of handling and using the products; failing to remove the products from the market when the Defendants knew or should have known the hair dye products were defective;

24

25

26

(e)     failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to the products which caused increased risk of bladder cancer;

27

28

(f)     failing to disclose to the public in general and the Plaintiff in particular the known dangers of using the products;

COMPLAINT

(g)    failing to advise users how to prevent or reduce exposure that caused increased risk for bladder cancer;

(h)    marketing and labelling the Products as safe for all uses despite knowledge to the contrary; and,

(i)    failing to act like a reasonably prudent company under similar circumstances.

161. At all relevant times alleged herein, Defendants were aware of the foregoing, and that the products were not safe, fit, and effective for use as intended. Furthermore, Defendants were aware that the use of the products was hazardous to health, and that the Products carry a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered by Plaintiff as alleged herein.

162. At all relevant times alleged herein, that Defendants intentionally concealed and suppressed the true facts concerning the products with the intent to defraud the Plaintiff, other consumers, and the public in general, in that Defendants knew that Plaintiff would not have used the products if she had known the true facts concerning the risks and dangers of the hair dye products.

163. At all relevant times alleged herein, that as a result of the foregoing fraudulent and deceitful conduct by Defendants, Plaintiff suffered injuries and damages as alleged herein.

164. The foregoing fraudulent and deceitful conduct by Defendants amounts to unlawful, unfair, and fraudulent practices in violation of the UCL.

165. Defendants' acts, omissions, and practices described above constitute "unfair" practices because they are contrary to California's legislatively declared policy condemning deceptive advertising and marketing of goods and services. Defendants falsely represented the nature, quality, condition, ingredients, health hazards, and dangers posed by the hair dye products.

166.   Defendants' conduct constitutes unfair methods of competition and business practices.

167.   Defendants' acts, omissions, and practices described above are contrary to California public policy and constitute immoral, unethical, and unscrupulous practices that caused substantial injury to Plaintiff.

168.   All of Defendants' unlawful and unfair conduct, failures to disclose, and fraudulent practices and misrepresentations alleged herein occurred in the course of Defendants' respective businesses and were part of a generalized course of conduct.

169.   Defendants' unlawful, unfair, and fraudulent conduct alleged herein was designed to and did induce Plaintiff to purchase their products.

170.   Plaintiff would not have used the hair dye products but for Defendants' unlawful, unfair, and fraudulent business conduct.

171.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business conduct, Plaintiff has suffered concrete and particularized injuries, including monetary loss in the form of medical expenses, lost income and earning potential, and multiple other out-of-pocket expenses that she otherwise would not have incurred.

172.   Plaintiff is entitled to appropriate relief, including restitution and a permanent injunction prohibiting Defendants from engaging in the aforementioned practices that violate the UCL. Plaintiff further seeks reasonable attorneys' fees and costs under applicable law including California Code of Civil Procedure 1021.5

## VI.   JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b) Plaintiff hereby demands a trial by jury on all triable issues within this action.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above-referenced claims and causes of action, and as follows:

(a)   Awarding past and future non-economic compensatory damages including, but not limited to, physical injury, loss of bodily function, pain, suffering, discomfort, fright, nervousness, anxiety, worry, apprehension, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

(b)   Awarding past and future economic damages in the form of medical expenses, out-of-pocket expenses, lost earnings, opportunity costs, and other economic damages in an amount to be determined at trial of this action;

(c)   Awarding damages and/or equitable relief to provide medical monitoring for the early detection, diagnosis, and treatment of injuries related to the Products and prevention of exacerbation of such injuries;

(d)   Awarding punitive and/or exemplary damages for Defendants' wanton, willful, fraudulent, reckless acts which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public, and to Plaintiff, in an amount sufficient to punish Defendants and deter future misconduct;

(e)   Statutory damages;

(f)   Prejudgment interest;

(g)   Post-judgment interest;

(h)   Plaintiff's reasonable attorneys' fees and costs;

1       (i)    The costs of these proceedings; *and*

2       (j)    Such other and further relief as this Court deems just and proper.

3 DATED:  March 6, 2025

4                      *s/ Brian O. O'Mara*

                       BRIAN O. O'MARA

Brian O'Mara (Bar No. 229737)
Steven M. Jodlowski (Bar No. 239074)
DiCELLO LEVITT LLP
4747 Executive Drive, Suite 240
San Diego, California 92121
Tel.: (619) 923-3939
briano@dicellolevitt.com
stevej@dicellolevitt.com

Diandra S. Debrosse*
Eli J. Hare*
DiCELLO LEVITT LLP
505 20th Street S, Suite 1500
Birmingham, Alabama 35203
Tel.: (205) 855-5700
fu@dicellolevitt.com
ehare@dicellolevitt.com

Mark Abramowitz*
DiCELLO LEVITT LLP
8160 Norton Parkway, 3rd Floor
Mentor, Ohio 44030
Tel.: (440) 953-8888
mabramowitz@dicellolevitt.com

*Counsel for Plaintiff*

**Pro hac vice* application forthcoming